### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MONICA ROSE** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 12-82E** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE, COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

### I.  *Introduction*

Pending before this Court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the claims of Monica Rose ("Plaintiff" or "Claimant") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381 et. seq. (2012).  Plaintiff argues that the decision of the administrative law judge ("ALJ") should be reversed and the Commissioner directed to award Plaintiff benefits because the ALJ did not properly consider the medical evidence of record, and therefore, Plaintiff is entitled to benefits.  To the contrary, Defendant argues that the decision of the ALJ fully evaluated the opinions of treating, examining, and reviewing physicians as well as other relevant evidence and provided a rationale, supported by substantial evidence for denying SSI benefits to the Claimant and, therefore, the ALJ's decision should be affirmed. The parties have filed cross motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

For the reasons stated below, the Court will deny the Plaintiff's Motion for Summary Judgment and grant the Defendant's Motion for Summary Judgment and affirm the decision of the ALJ.

## II. Procedural History

On June 9, 2009, Plaintiff protectively filed an application for SSI alleging disability beginning September 15, 2007 following her involvement in a motor vehicle accident. (R. at 15, 20, ECF No. 7). The claim was initially denied on May 3, 2010. (R. at 15). On July 9, 2010, Claimant filed a written request for a hearing. Id. A hearing was held on April 14, 2011 where Claimant appeared and testified. Id. Mitchell A. Schmidt, an impartial vocational expert ("VE"), also appeared during the hearing. Id. On May 24, 2011, the ALJ, Barbara Powell, determined that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social Security Act. (R. at 28). The ALJ concluded that "[b]ased on the testimony of the [VE], the undersigned concludes that, considering the [C]laimant's age, education, work experience, and residual functional capacity, the [C]laimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 27). The Plaintiff requested a review of the hearing decision by the Appeals Council on July 13, 2011. (R. at 11). The Appeals Council denied Plaintiff's request for review and the Appeals Council upheld the ALJ's decision on January 24, 2012. (R. at 1).

## III. Medical History

### a. Physical

On September 15, 2007, Plaintiff was admitted to the hospital following an automobile accident. (R. at 219). The admitting diagnosis was a concussion with loss of consciousness greater than 5 minutes but less than 30 minutes; rib fractures; fractures of the transverse

processes of T6-T9; pulmonary contusion; and scalp laceration.  Id.  A CT Scan of the head on admission showed extensive laceration to the left scalp.  Id.  A CT Scan of the cervical spine on admission was unremarkable.  Id.  CT of the thorax on admission showed an area of consolidation versus contusion in the right middle lung, and fracture of the left 9th and 11th posterior ribs, as well as fracture of the 6th-9th transverse processes on the left.  Id.

While in the hospital Plaintiff was referred to Susan M. Evans, Ph.D. for a neuropsychological assessment due to the concussion sustained from the automobile accident. (See R. at 220).  Dr. Evans reported that Plaintiff was alert and oriented X 4.  (R. at 237).  The doctor noted confusion but said the Plaintiff was able to interact with her appropriately and there was no confusion during the administration of the neuropsychological screen.  Id.  Plaintiff was able to register and repeat back 4 unrelated words, sentences of varying mean length of utterance, and 6 digits.  (R. at 237-38).  Confrontational naming was intact, both within broad category and for details.  She was able to perform mathematical calculations and spell the word "world" backwards.  (R. at 238).  Dr. Evans reports that Plaintiff was demonstrating a moderate disturbance in short-term memory.  Id.  Plaintiff was discharged from the hospital in stable condition on September 18, 2007.  (R. at 220).

X-rays of the Plaintiff's left shoulder on October 1, 2007 revealed a density projected lateral to the greater tuberosity of the proximal right humerus. (R. at 258).  The radiologist determined the density to be a possible foreign body in the soft tissues overlying the right shoulder.  Id.  On October 5, 2007, Brian Zimmerman, PA-C, a physician's assistant associated with Orthopaedic & Sports Medicine of Erie, P.C. examined the Plaintiff for follow-up care.  (R. at 292).  An examination of the right upper extremity showed a well-healed abrasion to the lateral aspect of the right shoulder with no other obvious abnormalities.  Id.  There was increased

pain with forward flexion of the right upper extremity on right arm crossover test; rotator cuff strength was equal bilaterally; internal rotation, external rotation, and abduction versus resistance caused increased pain; distal neurovascular status was intact. Id.

On October 18, 2007 Plaintiff was seen at Corry memorial Hospital where a soft tissue sonogram of the right hip revealed a possibly liquefied hematoma as post-traumatic residual. (r. at 257).

On November 12, 2007, Carl Y. Seon, M.D. a physician associated with Orthopaedic & Sports Medicine of Erie saw Plaintiff for complaints of right shoulder pain with overhead activity and right hip discomfort. (R. at 291). A physical examination revealed that cervical spine range of motion was symmetric, Plaintiff had full range of motion, forward flexion, and internal and external rotation. Id. The examination also showed that the Plaintiff had 5/5 internal rotation and 5/5 external rotation strength. Id. A Speed's test and Hawkins sign was equivocal.[1] Id. Dr. Seon stated the Plaintiff was neurovascularly intact. Id.

On April 10, 2008 a CT of the brain was normal with and without contrast. (R. at 268).

On April 13, 2008 Plaintiff presented to the Emergency Room at Hamot Medical Center for acute low back pain, headache, and nausea that followed the CT scan on April 10, 2008. (R. at 281). A straight leg-raising test was normal,[2] and a neurologic evaluation revealed that motor strength, flexion, extension, sensation and reflexes were entirely normal. Id. Diagnosis was acute low back pain and urinary tract infection. (R. at 283).

Dr. Seon saw Plaintiff again on April 14, 2008 for right shoulder pain and right gluteal swelling. (R. at 290). Examination again revealed no significant tenderness but that X-rays of

---

[1] A Speed's test is used to test for superior labral tears or bicipital tendonitis. (Def.'s Br. Supp. Summ. J. 6 n.3, ECF No. 12, (citation omitted) (hereinafter ECF No. 12)). The Hawkins impingement sign involves pain produced by forced internal rotation of the humerus in 90° of abduction. (ECF No. 12 at 6 n. 4 (citation omitted)).

[2] A straight leg raising test is used to evaluate possible nerve root pressure, tension, or irritation of the sciatic nerve. (ECF No. 12 at 6 n.5 (citation omitted)).

the right clavicle showed that it had probably gone to a fibrous type union. Id. Dr. Seon recommended physical therapy for swelling control and to return to the Orthopaedic practice in four weeks. Id. Plaintiff did not perform either follow up tasks. (R. at 299).

On January 13, 2009 Plaintiff saw Jason Edwards, PA-C, a physician's assistant, for a routine medical check-up. Id. Plaintiff reported that she still suffered from post-concussive headaches but that her medication (Meloxicam) helped. Id.

On October 13, 2009, Dr. Seon performed surgery to remove glass from the right shoulder, a mini open distal clavicle excision, and excision of chronic nonunion. (R. at 360). Plaintiff tolerated the procedure well and on October 22, 2009 Dr. Seon stated the incision looked good and that Plaintiff was neurovascularly intact. (R. at 398). On November 5, 2009 Dr. Seon stated that the incision had healed well and Plaintiff had full range of motion. Id.

On October 27, 2009, John C. Kalata, D.O., performed a consultative physical examination. (R. at 363-67). Dr. Kalata reports that Plaintiffs main complaints were headaches and pain all over her body, specifically in the back, neck, hips and legs. (R. at 363). A physical examination revealed that she had some restricted motion of the neck, but was able to toe walk, heel walk, and squat. Id. Her motor power was 5/5; there was no evidence of atrophy; a straight leg-raising test was negative as it produced pain at 75 degrees.[3] Id.

On October 28, 2009 Plaintiff presented to the emergency room with complaints of lightheadedness, dizziness, and forgetfulness. (R. at 374). A CT scan of the head was negative. Id. A functional assessment revealed that the Plaintiff was independent in activities of daily living, she was able to move all extremities and had no limitations of range of motion. (R. at 379). A physical examination revealed that Plaintiff's neck was supple and there were no

---

[3] A positive straight leg raising test requires reproduction of pain at an elevation of the leg at less than sixty degrees. (ECF No. 12 at 6 n.5 (citations omitted)).

respiratory or cardiovascular symptoms. (R. at 375). A neuro/psych examination revealed that orientation, speech/cognition and mood/affect were all normal, and that motor strength and sensation were normal as well. Id.

On December 17, 2009 physician's assistant Edwards noted Neurontin had really helped Plaintiff's post-concussive type headaches. (R. at 518).

On March 20, 2010 Plaintiff presented to the emergency room with complaints of right hip pain. (R. at 422). A physical examination revealed normal joints, normal range of motion in the joints, normal gait/weight bearing, and no evidence of vascular compromise. (R. at 423). Sensation and motor strength were normal as well as data from a respiratory and cardiovascular examination. Id. Claimant was admitted to the hospital and then transferred to Hamot Medical Center for increased pain and sciatica. (R. at 444-59). X-rays of the right hip showed minimal cystic change in the lateral superior acetabulum which could represent a minimal degenerative subchondral cyst. (R. at 457). A March 21, 2010 x-ray of Plaintiff's lumbar spine was normal. (R. at 458). On March 21, 2010 Nicholas Crosby, M.D. performed a consultative examination with no significant findings except that Plaintiff stated she had been moving homes over the last few weeks and had been doing continuous lifting and lots of yard work. (R. at 445). Plaintiff had a moderately positive straight leg-raising test and knee extension test suggestive of sciatica. (R. at 446). Dr. Crosby said it was "likely routine low back pain after exertion with possible component of transient sciatica. Id. On March 22, 2013 Plaintiff was discharged home in stable condition and with a straight cane. (R. at 449, 484). On January 1, 2011 Plaintiff returned to the hospital with the same complaints. There were no significant findings upon examination. (R. at 553, 557).

On April 28, 2010 Mary Ellen Wyszomierski, M.D. performed a physical residual functional capacity assessment based upon her review of the record. (R. at 490-6). Dr. Wyszomierski found that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of at least 2 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and that her ability to push and/or pull was unlimited except as shown for lifting and/or carrying. (R. at 491). Dr. Wyszomierski also found that Plaintiff could perform postural maneuvers such as climbing, balancing, stooping, kneeling, crouching, and crawling occasionally. (R. at 492). No manipulative, visual, or communicative limitations were found. (R. at 492-3). Dr. Wyszomierski did find that Plaintiff should avoid concentrated exposure to extreme heat, wetness, vibration, and hazards such as machinery and heights but that she had no limitations with respect to exposure to extreme cold, humidity, noise, and fumes, odors, dusts, gases, and poor ventilation. (R. at 493). Dr. Wyszomierski also noted that Plaintiff did not require an assistive device to ambulate, and that she was able to care for her children, prepare light meals, do chores with breaks, drive and shop. (R. at 496). Finally, the doctor noted that Plaintiff was not currently under the care of a specialist for headaches and that Plaintiff's headaches did not seem to be of a disabling nature. Id.

### b. Mental

Plaintiff has a history of mental health treatment from December 3, 2007 through June 23, 2009. (R. at 313-41). Plaintiff began treating with Asha Prabhu, M.D. at Corry Counseling Services in 2007. (R. at 304-41). On April 22, 2008, Dr. Prabhu performed a psychiatric evaluation where Plaintiff reported she was separated and living with her boyfriend and two children. (R. at 316). Plaintiff reported she had been depressed for the past year but that she had been receiving therapy, which was helping a lot. Id. Dr. Prabhu's mental status evaluation

revealed that the Plaintiff was alert and oriented and although her mood was depressed, her speech was relevant and goal directed and she was not delusional. Plaintiff denied auditory or visual hallucinations and suicidal or homicidal ideations. Plaintiff showed no assaultive or self-abusive behavior. Her memory, abstract thinking, and concentration were intact; her intelligence was average based upon verbal skills; and her insight and judgment were intact. (R. at 317). Dr. Prabhu's diagnosis included major depressive disorder, recurrent; psychosocial stressors – moderate to severe; and a GAF of 55-60.[4] Id.

On July 23, 2008 Plaintiff returned to Dr. Prabhu and reported that she was doing well although she had feelings of helplessness, hopelessness, and anhedonia. (R. at 322). She denied suicidal or homicidal ideations. Id. Dr. Prabhu adjusted the Claimant's medication and from August 2008 through January 2009 Plaintiff felt medications were helping. In January of 2009 Claimant felt medication was not working and Nurse Eastman transitioned Plaintiff to a new medication. (R. at 331,323). On May 11, 2009 Plaintiff reported feeling better but remained depressed and was unable to handle stress and was having anxiety/panic. (R. at 339). By June 2009 Plaintiff reported having extreme anxiety and panic due to a breakup with her boyfriend. (R. at 341). Dr. Prabhu put Plaintiff on a new medication.

On March 9, 2010 Byron E. Hillin, Ph.D., saw Plaintiff for a consultative psychological evaluation. (R. at 412-20). Plaintiff said she could not work due to irritability, depression, and problems with concentration and attention. (R. at 412). She described herself as forgetful but acknowledged her "memory difficulties" were mild. (R. at 413). Plaintiff also reported she had difficulty sustaining attention and concentration but she continued her activities of daily living

---

[4] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and is used by a clinician to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R). (ECF No. 12 at 13-14 n. 10). The greater the number the higher the functioning of the individual.

such as cooking, cleaning, shopping and paying bills. (R. at 415). She reported socializing with friends, family and her ex-husband. After his clinical interview, Dr. Hillin noted that Plaintiff's cognitive abilities were intact across a broad range of domains including attention, concentration, and short-term and long-term memory and that her processing speed was good. (R. at 417). Dr. Hillin recommended continued treatment for Plaintiff for her chronic depression but that her ability to understand, remember, and carry out instructions was not affected by her impairment. (R. at 419). Dr. Hillin found Plaintiff had moderate limitations in her ability to interact appropriately with the public and co-workers, moderate limitations in her ability to respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting, and slight limitations in her ability to interact appropriately with supervisors. Id. Dr. Hillin diagnosed Plaintiff with major depressive disorder, recurrent type; anxiety disorder, not otherwise specified, mild; borderline personality features; and a current GAF of 65. (R. at 417).

On March 22, 2010 Ray M. Milke, Ph.D. performed a mental residual functional capacity assessment based upon his review of the record. (R. at 460-3). Upon conclusion, Dr. Milke determined that Plaintiff had the functional capacity to perform the basic mental demands of competitive work on a sustained basis. (R. at 462). He stated that Plaintiff retained the ability to perform repetitive work activities without constant supervision, and that there were no restrictions in her abilities with respect to understanding, memory, and sustaining concentration and persistence. Id.

Plaintiff saw Dr. Prabhu on regular intervals where she reported both positive days and negative days but overall her mental state seemed to be well controlled by medication. (ECF No. 12 at.18-19). Dr. Prabhu completed a medical source statement on March 15, 2011 regarding

Plaintiff's mental health in relation to work-related activities. Dr. Prabhu reported that Plaintiff has moderate limitations in her ability to understand and carry out instructions and make work-related decisions. (R. at. 526-40). He further indicated that Plaintiff has marked limitations in her ability to interact appropriately with the public, supervisors, and co-workers; and to respond to work pressures in a usual work setting. (R. at 539). However, Dr. Prabhu did not complete several sections of the form, including the sections that pertained directly to the types of jobs recommended by other evaluators. (R. at 539-40). Dr. Prabhu also did not provide any medical/clinical findings to support his conclusions. Id.

### IV. Summary of Testimony

On April 14, 2011, Plaintiff testified that she became disabled on September 15, 2007 due to her car accident. (R. at 41). She further stated that she becomes stressed, and has panic and anxiety attacks, depression, constant headaches and numbness on the left side of her head, and neck and back problems. (R. at 42). She also claimed she uses a cane periodically due to sciatica. (R. at 53). Plaintiff said she spent her days sleeping, listening to music, plays cards with her boyfriend and sometimes her Mom comes to visit. (R. at 45). Plaintiff takes medications to address her mental and physical conditions.

Also at the April 14, 2011 hearing, VE, Mitchell A. Schmidt, testified. The VE was asked what types of jobs could a person perform given the restrictions that were noted in Plaintiff's case by Dr. Wyszomierski, mentioned earlier, such as could lift and carry 20 pounds occasionally and 10 pounds frequently, could walk in excess of two hours but less than 6 hours, could stoop, crouch, crawl, squat, kneel, and balance but could not use ladders, scaffolds, dangerous heights, or machinery and should avoid concentrated exposure to heat, cold, and vibrations. (R. at 55). Also the VE was asked to take into consideration that the type of job

should have minimal contact with the general public due to anxiety and stress. (R. at 55-6). The VE testified that Plaintiff would be suited to return to her work as an assembler of small parts and a toy assembler, as well as other jobs that exist in significant numbers in the national economy. (R. at 55-7, 60).

## V. *Standard of Review*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F)(2012).

## VI. *Discussion*

Under SSA, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period

of not less than 12 months ..." 42 U.S.C. §§ 416(i)(l); 423(d)(1)(A); 20 C.F.R. § 404.1505 (2012). A person is unable to engage in substantial activity when he:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under SSA, a five-step sequential evaluation process must be applied. See 20 C.F.R. § 404.1520; McCrea v. Commissioner of Social Security, 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows: At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, the Commissioner must determine whether the claimant has a severe impairment. See id. § 404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past relevant work. See id. at § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering her residual functional capacity and age, education and work experience. See id. § 404.1520(a)(4)(v). See also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). In this case, the Commissioner uses the sequential evaluation process and determines at step (4) that the Plaintiff has not met her burden

of proof that she cannot return to her past work as a factory assembler. Therefore, because the Plaintiff was determined able to perform her past work she was found not disabled by the ALJ. (ECF No. 12 at 23). The Commissioner also determines that Plaintiff could perform other jobs that exist in significant numbers in the national economy as stated in step (5).

In support of her motion for summary judgment, Plaintiff generally argues that the ALJ relied upon portions of multiple opinions of the non-examining State Agency medical consultants, Dr. Milke and Dr. Hillin but did not give proper deference to Plaintiff's treating physician Dr. Prabhu. (Pl.'s Br. Supp. Summ. Ju. 10-11, ECF No. 10 (hereinafter ECF No. 10)). Dr. Milke opined that the Plaintiff has major depressive disorder, anxiety disorder, and borderline personality disorder. (ECF No. 10 at 11). Dr. Hillin opined that the Plaintiff has major depressive disorder, anxiety disorder, and borderline personality features. Id. However, both of these doctors only found the Plaintiff to be mild to moderately affected by the symptoms of those diagnoses. Further, Plaintiff argues that Dr. Wyszomierski, the state agency medical consultant who provided the physical residual functional capacity assessment, is not an acceptable medical source, and therefore, her opinion does not meet the standards of substantial evidence. (Id. at 13-14). Dr. Wyszomierski's evaluation was the basis for the VE finding that jobs exist in significant numbers in the national economy for which the Plaintiff is qualified.

Dr. Prabhu, on the other hand, opined that Plaintiff experienced manic episodes that involved high risk behaviors and irrational spending. Dr. Prabhu also stated that Plaintiff has moderate limitations in her ability to understand, remember, and carry out instructions. Further, she stated that Plaintiff has marked limitations in her ability to respond appropriately to supervisors, coworkers, and work pressures in a regular setting. (Id. at 11).

In response to Plaintiff's arguments, Defendant generally alleges that the ALJ's determination that Plaintiff was not disabled is supported by substantial evidence. Furthermore, the Commissioner refutes Plaintiff's accusation that the ALJ did not give adequate weight to Plaintiff's treating physician stating that under 20 C.F.R. § 416.927(d), "a treating physician's opinion about a claimant's ability to work . . . is not entitled to any special deference." (ECF No. 12 at 24). Controlling weight is given to a treating source's opinion given the length of treatment, nature and extent of treatment relationship, supportability (i.e. medical signs and laboratory findings), and consistency with other evidence of record. See 20 C.F.R. § 416.927(c). It is the Commissioner's assertion that the ALJ considered all the evidence of record, including treatment notes of treating physician Dr. Prabhu, notes from evaluators Drs. Hillin and Milke, and the Plaintiff's own statements when determining that Plaintiff was not disabled and eligible to work. In addition, the Commissioner states the record makes clear that Dr. Wyszomierski is an acceptable medical source as a licensed medical doctor. We agree with the Commissioner on all points.

### Whether the ALJ Erroneously Evaluated the Medical Evidence

As the finder of fact, the ALJ is required to review, properly consider, and weigh all of the medical records provided concerning the Plaintiff's claims of disability. See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001) (citing Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir. 1979)). "In doing so, an ALJ may not make speculative inferences from medical reports." Plummer v. Apfel, 186 F.3d 422, 429 (3d. Cir 1999). When the medical evidence of records conflicts, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason." Id. (citing Mason v. Shalala, 994 F2d 1058, 1066 (3d. Cir. 1993)).

According to Plaintiff, the ALJ erred in not giving adequate weight to the Plaintiff's treating medical doctor. (ECF No. 10 at 11). Plaintiff cites to Akers v. Callahan stating that the ALJ must consider all medical evidence of record and provide adequate reasons for dismissing or discrediting evidence, especially when treating physician testimony is discarded. 997 F. Supp. 648, 653 (W.D. Pa 1998). Plaintiff continues by saying that the ALJ did not mention Dr. Prabhu's assessment, nor did she assign weight to the opinions expressed by Dr. Prabhu. (ECF No. 10 at 12). Plaintiff further states there was no evidence to contradict Dr. Prabhu's opinion, and therefore, Dr. Prabhu's opinion should have controlling weight. Id.

Plaintiff also argues that the ALJ did not follow the Commissioner's ruling at the Social Security Regulation 85-15 emphasizing, "A substantial loss of ability to meet any  . . . basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low stress" jobs." (ECF No. 10 at 13).

Finally, Plaintiff asserts that the ALJ only relied on "selected" portions of opinions from State Agency medical consultant, Dr. John Kalata and non-examining State Agency medical consultant, Mary Ellen Wyszomierski. (Id. at 14).

The Commissioner responded in his Brief in Support of Motion for Summary Judgment (ECF No. 12) with a laundry list of all his considerations when confirming the determination that the Claimant was not disabled.  More specifically, he notes that the ALJ considered the following, for example: Rose's statements to Nurse Eastman on November 3, 2010, that she had no problems with coworkers or crowded places, she also denied depression or panic attacks and felt her medication managed her anxiety. (Id. at 25). Dr. Prabhu's April 2008 finding that Plaintiff was benefitting from mental health therapy and medication and noted a GAF of 55-60,

indicative of moderate limitations. Id. Dr. Hillin's 2010 finding that Plaintiff had a GAF of 65, which finds Plaintiff at a slightly greater functioning level than Dr. Prabhu in 2008. The Court finds these assessments in no way contradictory, and, in fact, interprets them as relatively consistent with one another. The ALJ does not ignore the fact that Plaintiff's medications required adjusting for mental health management over time but it was also noted that the adjustments were often effective in Plaintiff's mental health management. (Id. at 25-6). The Commissioner provides this information as proof that the ALJ properly considered various data provided from Dr. Prabhu as well as data provided by Dr. Milke, the reviewing psychologist, and Dr. Hillin, the psychologist who performed a consultative examination. (Id. at 27). The District Court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. See Burns v. Barnhart, 312 F.3d at 113, 118 (3d Cir. 2002). Here we find a plethora of substantial evidence from various credible sources.

**Whether the ALJ Committed an Error of Law in his Assessment of the Evidence of Record Regarding the Plaintiff's Mental Impairments.**

In support of Plaintiff's argument, other cases have found the treating physicians' reports to be the deciding factor in a determination of disability. Treating physicians' reports should be accorded great weight, especially "when the opinion reflects on expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987); See 20 C.F.R. § 404.1527(d)(2). Moreover, the ALJ must consider all evidence and give some reason for dismissing the evidence he chooses to reject. See Plummer, 186 F. 3d at 429 (citing Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983).

The regulations offer that more weight is given to a claimant's treating physician because:

[T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).

Further, "Where a treating source's opinion on the nature and severity of a claimant's impairment is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," it will be given "controlling weight." Id.

The Commissioner considers the following factors in determining the weight to be given to a treating physician: (1) "the [l]ength of treatment relationship and the frequency of examination; (2) the [n]ature and extent of the treatment relationship; (3) whether the diagnosis is supported by the source's findings; (4) whether the diagnosis is consistent with the record as a whole; (5) whether the source is a specialist in any given area; and (6) any other reason to give a particular source weight in determining disability." 20 C.F.R. § 404.1527(d).

As stated above, the ALJ cited to several medical resources, including treating physician, Dr. Prabhu, as well as Dr. Wyszomierski and the VE in determining the credibility of Plaintiff's subjective description of her limitations and her limitations for work. In 2007, the VE, based on Dr. Wyszomierski's evaluation[5] that Plaintiff could lift and carry 20 pounds occasionally and 10

---

[5] It is worth noting that while not identical, Dr. Wyszomierski's assessment is consistent with the October 27, 2009 assessment of Plaintiff performed by Dr. Kalata. Dr. Kalata opined that Plaintiff could lift or carry 2-3 pounds frequently and 10 pounds occasionally, stand and walk for 1 hour or less, and sit without limitation. He reported she was limited in her ability to push and pull using both the upper and lower extremities, but that she could bend, kneel, stoop, crouch, balance, and climb occasionally. He asserted she should not be exposed to poor ventilation, heights, vibration, wetness, dust, and fumes/odors/gases. (R. at 372-3). In summary, both evaluators find Plaintiff to be able to perform some kind of work.

pounds frequently, could walk in excess of two hours but less than 6 hours, could stoop, crouch, crawl, squat, kneel, and balance but could not use ladders, scaffolds, dangerous heights, or machinery and should avoid concentrated exposure to heat, cold, and vibrations and taking into consideration that the type of job should have minimal contact with the general public due to anxiety and stress, (R. at p. 55-6), the VE reported that there were jobs in significant numbers in the national economy that are appropriate for a person with the same restrictions as Plaintiff and jobs such as her past work or that of garment sorter. (R. at 55-64).

In this case we do not find the ALJ to have rejected the opinion of the treating physician. In fact, to the contrary, we find that the ALJ considered much of the data provided by the treating physician, including data that found the Plaintiff moderately disabled in some areas and data that found Plaintiff to be functioning at a higher level. It is the opinion of this Court that the ALJ, properly considered Dr. Prabhu's data as well as data from other medical professionals, with proper credentials, to determine that Plaintiff is not disabled under the law. We further find that this determination is supported by substantial evidence in the record. In particular, the ALJ noted that "several physicians/psychologists/mental health practitioners, including Dr. Prabhu, Dr. Kalata, Dr. Hillin, and Nurse Eastman documented consistently over time that Rose's mental status was stable and that her medications had been effective in addressing her mental health problems." (ECF No. 12 at 27). It is a well-accepted principle that if a condition can be controlled with medication or treatment, it is not disabling under the Act. (Id; Lovelace v. Bowen, 813 f.2d 55, 59 (5th Cir. 1987); See eg., Brown v. Bowen, 845 F.2d 1211, 1215 (3d Cir. 1988).

Moreover, we understand from the record that the ALJ finds the bulk of medical evidence on record consistent with the evaluations of Drs. Hillin and Milke, and therefore, the ALJ found

their opinions were persuasive in that Plaintiff was capable of handling some type of work. Because state agency medical and psychological consultants are "highly qualified" physicians and psychologists and "experts in the evaluation of the medical issues in disability claims under the Act," their opinions are entitled to weight. See SSR 96-6p; 20 C.F.R. § 416.927(e)(2). We find this argument persuasive in considering the weight to be afforded to each evaluator's opinion.

Further, the ALJ provided persuasive reasoning for rejecting Dr. Prabhu's evaluation as having great or controlling weight; Dr. Prabhu filled out a check-marked form that provided conclusions that were without support and inconsistent with other substantial evidence in the record. The form was also incomplete lacking answers to several pertinent questions. (See R. at 538-40; Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (stating that forms requiring a physician to only check boxes or fill in blanks are weak evidence at best, and that when such forms are unaccompanied by thorough written reports their reliability is suspect.)). While, the report was completed on March 15, 2011, and was one of the most recent reports provided on the Plaintiff's condition, it was only a few months after another report dated December 21, 2010 which states, "Patient comes in and states that she is doing very well . . .She gets anxiety attacks once in a blue moon but the medications are helping." (R. at 526). The ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, and not on the basis of the Commissioner's own judgment or speculation, although he may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. See Plummer, 186 F.3d at 429. Thus, the ALJ rightly considered all medical opinions as a whole, assigning proper weight to each evaluating professional based on the evidence of record. The overwhelming majority of evidence of record as a whole supports a

finding that Plaintiff is not disabled and that there is available work in the national economy which would be appropriate for Plaintiff in light of her medical conditions.

## VII.   *Conclusion*

For the foregoing reasons, we conclude that there is substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Plaintiff's Motion for Summary Judgment is denied.   The Defendant's Motion for Summary Judgment is granted and the decision of the ALJ is affirmed.

An appropriate order will be entered.

Date: *July 8, 2013*

Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:   counsel of record